Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 C 5236 | DATE | 10/27/2004 |
| CASE TITLE | Wilson Sporting Goods vs. Penn Partners | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

1) ☐ Filed motion of [ use listing in "Motion" box above.]
2) ☐ Brief in support of motion due _____.
3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
4) ☐ Ruling/Hearing on _____ set for _____ at _____.
5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
7) ☐ Trial[set for/re-set for] on _____ at _____.
8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Penn's motion to strike (79-1) is granted. Penn's motion (51-1) for summary judgment on Wilson's claims for specific performance (Count I) and tortious interference (Count II) is granted. Wilson's cross-motion (59-1) on its claim for specific performance is denied. Wilson's motion (67-1) for summary judgment on Penn's counterclaim for fraud in the inducement (Count II) is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | OCT 28 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 88 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 10/27/2004 | |
| | | | date mailed notice | |
| GL | courtroom deputy's initials | | GL | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILSON SPORTING GOODS CO., A Delaware Corporation. | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 03 C 5236 |
| PENN PARTNERS, a California General Partnership | ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

DOCKETED
OCT 28 2004

MARVIN E. ASPEN, District Judge:

Plaintiff Wilson Sporting Goods ("Wilson") and Defendant Penn Partners ("Penn") entered into an option agreement for the purchase of certain property in River Grove, Illinois. When Penn would not sell the property to Wilson, Wilson filed a claim for specific performance of the option agreement and a claim for tortious interference based on its inability to sell the River Grove property to its third party purchaser. Penn filed a counterclaim for material breach of contract and fraudulent inducement, seeking a declaratory judgment that it has no obligation under the option agreement and damages.

Penn has moved for summary judgment on Wilson's claims and its counterclaim for a declaratory judgment. Wilson has filed a cross-motion for summary judgment on its specific performance claim and has also filed a motion for summary judgment on Penn's counterclaim for fraudulent inducement. Penn has also moved to strike Wilson's Supplemental Local Rule 56.1(a)(3) Statement. For the reasons stated below, we grant Penn's motions to strike and for summary



judgment. We deny Wilson's cross-motion for summary judgment and grant its motion for summary judgment on Penn's counterclaim for fraudulent inducement.[1]

I. **Motion to Strike**

Before we can reach the merits of the parties' motions for summary judgment, we must address Penn's motion to strike Wilson's Supplemental Local Rule 56.1(a)(3) Statement. On a motion for summary judgment, a movant must submit, under Local Rule 56.1(a)(3), a statement of material facts as to which there is no genuine issue. The non-movant must then submit a response to the moving party's statement under 56.1(b)(3)(A), and a statement of any additional material facts that require denial of summary judgment under 56.1(b)(3)(B). If additional material facts are submitted by the non-movant under 56.1(b)(3)(B), the movant may then submit a concise reply to those additional facts.

On July 21, 2004, Penn filed a motion for summary judgment and filed a Local Rule 56.1(a)(3) statement of material facts in support. On August 24, Wilson filed a cross-motion for summary judgment and a 56.1(a)(3) statement of material facts in support, and also filed its 56.1(b)(3)(A) response to Penn's statement on the motion. On September 13, Penn filed its 56.1(b)(3)(A) response to Wilson's statement on the cross-motion and a 56.1(b)(3)(B) statement of additional facts on the cross-motion.[2] On September 23, Wilson filed its reply to Penn's

---

[1] Penn's counterclaim for breach of contract (Count I) seeking a declaratory judgment and monetary damages has not been challenged in these motions. This Order renders Penn's declaratory judgment request as to Count I moot but has no effect as to monetary damages.

[2] Wilson argues that Penn's September 13 statement of additional facts was filed as a supplement to Penn's motion for summary judgment, and it is simply doing the same. However, it is clear from Penn's brief that its September 13 statement was properly submitted as a 56.1(b)(3)(B) statement of additional facts in opposition to Wilson's cross-motion.

2

56.1(b)(3)(B) statement of additional facts and a "Supplemental Local Rule 56.1(a)(3) Statement," presenting additional facts.

Our Local Rules do not allow a movant to submit a supplemental set of facts in support of its motion for summary judgment with its reply. *See, e.g., Northfolk S. Ry. Co. v. Gee Co.*, No. 98-C-1619, 2001 WL 710116, *1 n. 1 (N.D. Ill. 2001). This is what Wilson has attempted to do in filing a "Supplemental Local Rule 56.1(a)(3) Statement." Penn's motion to strike is granted.

## II. Motions for Summary Judgment

### A. Factual Background[3]

Wilson was a lessee of the commercial property located at 2233 West Street, River Grove, Illinois (the "River Grove" property), pursuant to a 1984 lease agreement, with Penn as landlord. In addition, Wilson and Penn were parties to an Agreement Relating to Sublease ("ARS"), which allowed Wilson to sublet the River Grove property subject to certain conditions, including an environmental indemnity clause at Appendix B of the agreement. Under this clause, Wilson would indemnify Penn for "any regulatory investigation . . . cleanup, remedial, removal or restoration work...which investigation or work . . . is necessitated by the presence . . . of the graphite dust, any Friable Asbestos or Hazardous substances in or under the plating room and/or in, under or migrating from the former underground storage tank area . . . ."

In early 1993, Wilson and Penn entered into negotiations for an option agreement in which Wilson would loan Penn $2 million in exchange for which Penn would grant Wilson an option to purchase the River Grove property. During these negotiations, Penn requested that the rider to the

---

[3]The following facts, unless otherwise specified, are culled from the parties' Local Rule 56.1 Statements of Undisputed Material Facts and supporting documents.

3

contract ("Rider") include an additional purchaser's indemnity ("Purchaser's Indemnity") running from Wilson in favor of Penn. As of July 12, 1993, Wilson had rejected inclusion of the Purchaser's Indemnity. During this same time, Wilson and Penn negotiated modifications of their lease agreement, which were laid out in a document called the "Side Letter." Among other modifications, the Side Letter amended Wilson's environmental obligations with regard to the River Grove property.

On July 12, 1993, in contemplation of a July 14, 1993 closing, Wilson's attorney sent to Penn's attorney final versions of the closing documents, including the Option Agreement, the Real Estate Sale Contract, and the Rider, which did not include the requested Purchaser's Indemnity. At the closing, Penn renewed its request that the Rider contain the Purchaser's Indemnity, and Wilson agreed to it. Penn's attorney drafted an indemnity provision and cut and pasted it into the Rider as paragraph D(iii). The manner in which the provision was cut and pasted into the Rider did not change the pagination of the Rider, nor did it change the footer indicating the original word processing file information. At the closing, Penn executed a $2 million promissory note in Wilson's favor and the Option Agreement. The final Option Agreement contained an Exercise of the Option clause, which stated:

> Purchaser may exercise the Option at any time prior to 5:00 p.m. Central Daylight Savings Time on June 1, 2003 (the "Expiration Date"), by written notice to Seller of Purchaser's intent so to exercise the Option, together with (i) four (4) copies of the Contract dated the date of said notice and executed by Purchaser, providing for a closing date no earlier than September 1, 2003, and (ii) the earnest money deposit specified in the Contract . . . .

The "Contract" in this clause was defined by a prior Grant of Option Clause as "the Real Estate Contract attached hereto at Exhibit B and made a part hereof." Exhibit B to the final Option Agreement contained a two-page modified pre-printed form entitled "Real Estate Sale Contract" and the Rider, including the Purchaser's Indemnity as paragraph D(iii), which stated:

> Purchaser hereby agrees to defend, indemnify and save and hold harmless Seller, and the partners, employees, trustees, attorneys and agents of Seller and of Seller's Partners from and against all claims, demands, causes of action, damages, costs, losses, liabilities and expenses (including, without limitation, attorneys fees and expenses) asserted or incurred at any time after closing hereunder in any way relating to, connected with, or arising out of any actual or alleged Defects or Violations of Law, including the cost of any investigation, remediation, removal or abatement of any hazardous or toxic materials or contaminants on or from the Property.

Also at the July 14, 1993 closing, Penn and Wilson executed a final form of the Side Letter which, among other provisions, required Wilson to furnish "semi-annual updates" on environmental activities to Penn every six months. The first semi-annual environmental update would have been due at the end of 1993, or very early 1994. On May 9, 1996, Penn Partners' counsel Lynne Shilling wrote to Wilson's counsel Ray Berens indicating that Penn Partners had not received any environmental reports and requesting an environmental update for the River Grove property. On June 10, 1996, Berens wrote back to Shilling regarding the requested environmental update. A letter providing an update on the status of environmental response activities by Wilson's consultant, Geraghty & Miller, dated June 20, 1996, was subsequently sent to Shilling.

In February 2003, Wilson informed Penn Partners that it has two prospective purchasers for the River Grove property and that it expected to exercise the option. In May 2003, Wilson entered into an agreement with CenterPoint Properties in which CenterPoint would be entitled to receive an assignment of Wilson's option to purchase the River Grove property, or to purchase the property from Wilson upon Wilson's exercise of its option. On May 27, 2003, Wilson sent to Penn a notice of intent to exercise the option, together with the Real Estate Contract, Rider, and earnest money. However, the Rider that Wilson sent to Penn was the version as it existed on July 12, 1993, instead of the final version at closing that included the Purchaser's Indemnity at paragraph D(iii). On June 11, 2003, Penn sent Wilson a letter rejecting Wilson's exercise of the option, at least in part because Wilson's notice of intent to exercise

the option included the Rider in the form it existed on July 12, 1993, instead of the final version of the Rider as of July 14, 1993. This letter also notified Wilson that it had not complied with the environmental reporting provisions contained in the Side Letter. On June 18, 2003, in response to a request from Wilson's attorney, Penn emailed Wilson the final version of the Rider. On July 2, 2003, Wilson sent Penn a letter enclosing a signed, final version of the Rider that had been emailed to it.

On July 28, 2003, Wilson filed its complaint seeking specific performance of the Option Agreement and a claim for tortious interference with contract. In December 2003, Penn filed an answer to the complaint asserting an affirmative defense that Wilson's claims are barred by fraud in the inducement. Penn subsequently filed a counterclaim asserting the same fraud in the inducement. Wilson and Penn have sought summary judgment on these claims.

**B.     Standard of Review**

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (citations omitted). Once the moving party has met this burden of production, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson,* 477 U.S. at 255.

C.  Analysis

1.  Specific Performance of Option and Tortious Interference

Penn has moved for summary judgment, arguing that there is no genuine issue of fact that Wilson failed to properly exercise its option to purchase the River Grove property. Therefore, Penn says, Wilson has no claim for specific performance on the option agreement (Count I) or tortious interference with contract (Count II) as a matter of law. Wilson has filed a cross-motion for summary judgment, arguing that there is no genuine issue of fact that Wilson did properly exercise its option and that it is, therefore, entitled to specific performance (Count I) as a matter of law.

In Illinois,[4] an option must be exercised in strict accordance with its terms. *Keene Corp. v. Chapple*, 716 F.2d 475, 477 (7th Cir. 1983) ("Notice of a decision to exercise an option is only sufficient to bind parties if in exact accord with option terms."); *WCC Funding Ltd. v. GAN Intern.*, 871 F. Supp. 1017, 1026 (N. D. Ill. 1994) ("The option, however, must be accepted according to its specific terms for the option to become a binding sales contract."); *see also Dep't of Pub. Works and Bldgs. v. Halls*, 35 Ill.2d 283, 285, 220 N.E.2d 167, 169 (Ill. 1966); *Chapman v. Brokaw*, 225 Ill. App. 3d 662, 666, 588 N.E. 2d 462, 466 (Ill. App. Ct. 1992); *O'Brien v. Bd. of Ed. of Sch. Dist. No. 189, East St. Louis*, 70 Ill. App. 3d 604, 607, 388 N.E.2d 1104, 1106 (Ill. App. Ct. 1979). Illinois law is particularly adamant in requiring that option contracts be strictly construed and that an option be considered exercised only if the person holding the opting power adheres exactly to the conditions precedent to its effective consummation. *See R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 924 F.2d 709, 712-13 (7th Cir. 1991); *Southwest Forest Indus., Inc. v. Sharfstein*, 482 F.2d 915, 924 (7th Cir. 1972) (citing *Morris v.*

---

[4]As we are exercising diversity jurisdiction over this case, we must apply Illinois state law as declared by the highest state court. In the absence of such declaration, we give great weight to the state's intermediate appellate court holdings. *See Commonwealth Ins. Co. v. Stone Container Co.*, 323 F.3d 507, 509 (7th Cir. 2003).

7

*Goldthorp*, 390 Ill. 186, 60 N.E.2d 857 (Ill. 1945); *Epton v. CBC Corp.*, 48 Ill. App. 2d 274, 197 N.E.2d 727 (Ill. App. Ct. 1964)). Parties may require specific acts for exercising an option, and failure to comply with these acts prevents effective exercise. *See In re Estate of Girga*, 15 Ill. App. 3d 916, 920, 305 N.E.2d 565, 568 (Ill. App. Ct. 1973) (citing *Epton*, 197 N.E. 2d 727, as an example); *see also Welch v. Jakstas*, 401 Ill. 288, 298, 82 N.E.2d 53, 59 (Ill. 1948) ("The parties to an option may or may not make payment an essential condition to the exercise and acceptance of an option.").

In *Lake Shore Country Club v. Brand*, the Illinois Supreme Court explained its rationale for the strict construction of an option exercise:

> "An option contract is unilateral . . . . Because but one party is bound thereby and the other is not, courts will exercise their discretion with great care in determining whether such a unilateral contract has been converted into a bilateral contract. If conditions precedent to the right to convert a unilateral contract into a bilateral one are not met, the unilateral contract does not become bilateral . . . . In order to avail himself of the right, the optionee must comply with the conditions set out in the option contract . . . . A court of equity cannot relieve the optionee from the effect of his failure to comply with the conditions on which he has been granted the privilege of buying."

171 N.E. 494, 501 (Ill. 1930) (internal citations omitted).

According to the Option Agreement, Wilson could exercise its option by "written notice . . . , together with (i) four (4) copies of the Contract dated . . . and executed . . . , and (ii) the earnest money deposit specified in the Contract." The "Contract" referred to the real estate contract attached to the Option Agreement at Exhibit B, which included the Rider as it was finalized at the July 14, 1993 closing.[5] There is no dispute that Wilson did not execute the Rider at Exhibit B as it was finalized at the July 14 closing when it attempted to exercise its option. Accordingly, it did not comply in strict accordance with the terms of the Option Agreement.

---

[5]Wilson has also asserted that the Rider is not part of the required executed "Contract" for the purposes of exercising the option. We address this argument below.

8

Wilson argues that its failure to strictly comply with the terms of the option was a result of an innocent and understandable ministerial error that occurred when its attorney delivered the superseded version of the Rider to Penn Partners instead of the final version. Wilson claims that this innocent ministerial error does not preclude an effective exercise of an option according to its specific terms, relying primarily on three Illinois cases: *Kadansky v. Fickett*, 54 Ill. 2d 14, 294 N.E.2d 262 (Ill. 1973); *Wentcher v. Busby*, 98 Ill. App. 3d 775, 424 N.E.2d 651 (Ill. App. Ct. 1981); and *Farley v. Roosevelt Mem'l Hosp.*, 67 Ill. App. 3d 700, 384 N.E.2d 1352 (Ill. App. Ct. 1978).[6] In each of these cases, however, unlike the present case, the only condition precedent for exercising the option was notification by the optionee to the optionor. Additionally, the optionees' changes to the terms of their agreements, whether they were "ministerial errors" or purposefully requested revisions, were related to the subsequent performance of the contracts, not to the conditions precedent to exercise of the option. In *Kadansky*, for example, the optionee's inquiry about a changed method of payment did not prevent him from exercising his option because the only condition for exercise was notice.

In *Wentcher*, the relevant option agreement stated "This Option may be exercised at any time with in the Option Period by Optionee notifying Optionor." 424 N.E.2d at 652. The court stated that "A separate paragraph of the option agreement provided that 'Upon exercise of the Option in accordance with the above paragraph, Optioner and Optionee shall execute the Real Estate Sales Agreement which is attached hereto as Rider C.'" *Id.* In holding that the optionee's submission of a different real estate agreement than the one at Rider C did not negate effective exercise, the court stated, "the option agreement did not require Rider C to be executed as a condition precedent to acceptance of the option

---

[6]Wilson also cites *Binder v. Hejhal*, 347 Ill. 11, 19, 178 N.E. 901, 904 (1931) for the proposition that small mistakes in documentation do not preclude enforcement of a valid contract. However, *Binder* does not deal with the exercise of an option, and therefore, we find it to be inapposite to the present case.

9

or that it be executed concurrently with exercise of the option . . . the giving of notice was the only act necessary for exercise of the option" *Id.* at 656.

Similarly, in *Farley*, the option agreement stated that the option was to be exercised by a signed written notice sent to the optionor via registered mail prior to the expiration date. 384 N.E.2d at 1354. A separate paragraph following this provision provided that "If this option is exercised as herein provided, the optioner and optionee will immediately sign the real estate sale contract attached hereto as Exhibit 1." *Id.* When the plaintiff optionee's attorney sent an incorrect version of the contract along with the notice to exercise option, the exercise was nonetheless valid because the act of executing the contract was a matter pertaining to the performance of the contract and not to its creation. *Id.* at 1357.

In each of these cases, the court recognized that Illinois requires strict compliance with the conditions precedent to the agreement, and found, on the basis of the agreements at issue, that the only condition precedent was timely notice. *See, e.g., Wentcher*, 424 N.E.2d at 655 ("Where one party gives an option to another party, the acceptance, to be valid, so as to conclude a contract between the parties, must in every respect meet and correspond with the proposed terms of the offer."); *Farley*, 384 N.E.2d at 1356 ("[F]or the exercise of an option to be valid, the acceptance must be in the precise terms of the offer contained in the option.")

Unlike these cases, Wilson was obligated to perform three separate conditions precedent to an effective exercise under its Option Agreement: delivering 1) notice, 2) four executed copies of the Exhibit B Contract, and 3) the earnest money. The execution and delivery of the final Exhibit B Contract was a necessary condition precedent to effective exercise of the option and not part of the subsequent performance. The failure to execute and deliver the final Exhibit B Contract, therefore, resulted in a failure to comply with a condition precedent to option exercise.

10

Next, Wilson argues that it did exercise the option in accordance with its exact terms under the strict, technical reading of the Option Agreement. According to Wilson, the exercise of option provision, which premised exercise upon "written notice . . . , together with four (4) copies of the Contract dated the date of said notice and executed by Purchaser" required execution of only the two-page modified pre-printed form entitled "Real Estate Sale Contract," and not the Rider. The Grant of Option clause defined the "Contract" referred to in the Exercise of Option clause as "the Real Estate Sale Contract attached hereto at Exhibit B and made a part hereof." Wilson argues that the Rider that was included in Exhibit B is separate from the "Contract," and is thus superfluous to exercising the option.

It is clear, however, that the Rider was not a separate document from the Contract, but rather was an integral part of it. The cover page of Exhibit B reads, "Exhibit B, To Option Agreement, The Contract," indicating that the entirety of Exhibit B is deemed to be the "Contract." Furthermore, the Rider is entitled, "Rider to that certain real estate contract dated _____," and paragraph A of the Rider states that "The captioned real estate contract is hereby modified, amended and supplemented as hereinbelow set forth . . . . Insofar as the terms and provisions of this Rider purport to modify or amend or are in conflict with the terms and provisions of said Real Estate Sale Contract, the terms and provisions of this Rider shall govern and control." It would be insensible for the exercise of option to require execution of the pre-printed modified form contract without the Rider, when the parties expressly state that the Rider modifies and supersedes conflicting terms in the form contract. There is no genuine issue of fact that the "Contract" included the two-page form and the Rider and that option exercise required execution of both in final form.

Wilson's final argument opposing Penn's summary judgment motion and in support of its cross-motion is that the version of the Rider submitted to Penn Partners did not alter the rights or obligations of either party, and therefore, submitting the superseded version of the Rider did not alter Wilson's

11

unequivocal exercise of the option. Specifically, Wilson argues that the Purchaser's Indemnity in the Rider is duplicative of the environmental indemnity clause in Appendix B of the parties' existing Agreement Related to Sublease (ARS). However, even assuming the clauses of these two different contracts did provide legally equivalent conditions,[7] that fact would be irrelevant. As discussed above, Illinois law requires that, for the exercise of an option to be valid, the acceptance must be in the precise terms of the offer contained in the option. A purported acceptance which changes the terms of an option or that varies, alters, or adds conditions to the offer set forth in an option constitutes a counter-offer rather than an acceptance. *See Farley*, 384 N.E.2d at 1356. The Option Agreement required that Wilson submit the Contract at Exhibit B to exercise the option, and, therefore, Wilson was required to submit the Real Estate Contract at Exhibit B, not what it deems to have the legally equivalent effect of that contract based upon obligations under other contracts.

Wilson failed to properly exercise its option to purchase the River Grove property as a matter of law and is, therefore, not entitled to specific performance of the option agreement. Accordingly, Penn's motion for summary judgment on Count I is granted, and Wilson's cross-motion on the same claim is denied.

Penn has also moved for summary judgment on Wilson's claim for tortious interference with contract (Count II), which is premised upon Wilson's contract to sell the River Grove property to a third party purchaser CenterPoint Properties. The alleged interference arises solely from Penn's allegedly improper refusal to sell the River Grove property to Wilson. As Penn is under no legal obligation to sell the property to Wilson because Wilson did not properly exercise its option, Penn cannot be held liable

---

[7]In fact, these two clauses do not appear to be legally equivalent. The Purchaser's Indemnity covers all environmental and non-environmental defects and violations, while the ARS is limited to four specific known environmental concerns at the River Grove property.

12

for tortious interference with Wilson's contract with a third party purchaser. Accordingly, Penn's motion for summary judgment on Count II is granted.

### 2. Fraud in the inducement[8]

Wilson has filed a motion for summary judgment on Penn's counterclaim for fraud in the inducement,[9] arguing that there is no genuine issue of fact that 1) the claim is barred by the statue of limitations, 2) the claim is barred by laches, and 3) partial performance by Wilson negates any intent not to perform. We hold that Penn's counterclaim for fraud in the inducement is barred by the statute of limitations and grant Wilson's motion for summary judgment.

In Illinois, a claim for fraud in the inducement is subject to a five year statute of limitations. *See* 735 Ill. Comp. Stat 5/13-205; *Lind-Waldock & Co. v. Caan*, 691 F. Supp. 57, 62 (N.D. Ill. 1988). Under Illinois law, the statute of limitations begins to run "when a person knows or reasonably should know of his injury and also knows that it was wrongfully caused. At that point the burden is upon the injured party to inquire further as to the existence of a cause of action." *Lind-Waldock & Co. v. Caan*, 691 F. Supp. 57, 62-63 (N.D. Ill. 1988) (quoting *Witherell v. Weimer*, 85 Ill. 2d 146, 156, 421 N.E.2d 869, 874 (Ill. 1981)).

Penn's fraud in the inducement claim is based upon its allegation that Wilson made promises contained in the 1993 Side Letter without any intention to perform them, with the scheme and intention of inducing Penn to execute the 1993 Option Agreement. Specifically, Penn alleges that Wilson never intended to submit the semi-annual environmental updates on the River Grove property that it was

---

[8]In its counterclaim for fraud in the inducement, Penn seeks a declaratory judgment that Penn has no obligation under the Option Agreement and monetary damages. Although it is unnecessary to address the counterclaim with regard to the declaratory judgment request given the analysis in Section II.C.1., we address it to the extent that Penn continues to seek monetary damages.

[9]Wilson's related motion to strike Penn's affirmative defense of fraud in the inducement is moot given our analysis in Section II.C.1.

required to submit every six months by the Side Letter. It is undisputed that the first update would have been due at the end of 1993 or early 1994, and successive updates would be due each six months following. It is also undisputed that Wilson did not submit the first update at the end of 1993 or early 1994, nor was such a semi-annual update submitted anytime in 1994, 1995, or early 1996. Thus, Wilson did not submit the first five required environmental updates. Penn first contacted Wilson about its failure to submit environmental updates on May 9, 1996.

Penn should have known of its injury–that Wilson did not intend to submit the environmental updates required by the Side Letter–when Wilson failed to submit its first update. Furthermore, Penn actually did know of its injury as of May 9, 1996, when it contacted Wilson about its failure to submit any environmental updates for over two years. If Penn was indeed induced into the Option Agreement by Wilson's fraudulent representation that it would submit the updates, Penn knew or should of known about this fraud by early 1994, or May 9, 1996 at the latest, when no updates had been submitted. The statute of limitations of five years, in either case, has run.

## III. Conclusion

For the reasons described above, we grant Penn's motion to strike. We grant Penn's motion for summary judgment on Wilson's claims for specific performance (Count I) and tortious interference (Count II) and deny Wilson's cross-motion on its claim for specific performance. We grant Wilson's motion for summary judgment on Penn's counterclaim for fraud in the inducement (Count II). It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated 10/27/04

14